EPHRAIM COBURN & others *vs.* CHARLES HOLLIS.

The making of a fence on wild land, by felling trees and lapping them together, is not sufficient to warrant a jury in presuming that the owner of the land had notice of such fence; nor does it amount to a disseizin of such owner.

The decision in *Bates v. Norcross*, 14 Pick. 224, recognized and confirmed

WRIT OF RIGHT. The demandants counted on the seizin of their ancestor, Ephraim Coburn, within 40 years. Plea, the general issue, with prayer for inquiry of seizin. The chief justice, before whom the case was tried, made the following report thereof :

The demandants claimed under an original laying out of a tract of land, which included the demanded premises, by the town of Chelmsford to Joseph Parker, as appears by the record of said town, dated January 21st 1722 – 3. They also produced a deed of said tract from Ebenezer Parker and William Butterfield, as executors of Joseph Parker, to Jonathan Parkhurst, dated April 24th 1758 ; a deed from said Parkhurst of one undivided half of the same land to Ephraim Coburn, (the demandants' ancestor,) Amos Coburn, John Coburn, Henry Coburn, and Jonathan Parkhurst junior, dated February 26th 1770 ; and a deed from Reuben Lewis, conveying one half of said land to Ephraim Coburn, (the demandants' ancestor,) Henry Coburn, John Coburn, Amos Coburn, and Jonathan Parkhurst junior, dated January 15th 1771, purporting to be a division of the same land which was described in the former deeds — reciting that the grantees had released one half to the grantor. None of the foregoing deeds were recorded until November 19th 1800.

The question before the jury related to the boundaries of the aforesaid division.

In 1792, by deed dated May 31st, recorded in 1793, Jonathan Parkhurst junior conveyed to William Adams one undivided fifth part of the land conveyed to him and to the Coburns by Reuben Lewis. June 6th 1792, Amos Coburn conveyed one fifth of the same land, undivided, to said Adams. The deed was recorded September 30th 1793.

In 1793, William Adams, Ephraim Coburn, (the demand-
ants' ancestor,) Henry Coburn, and John Coburn, caused the
land to be surveyed and divided into five parts or lots ; and on
the 15th of April 1793, said John, Henry and Adams, exe-
cuted to said Ephraim Coburn a quitclaim deed of one of said
lots, which embraces the demanded premises. This deed was
recorded April 15th 1840, and purports to convey a lot of
woodland containing thirty-four acres, which is the northerly
lot of the five lots divided as aforesaid ; and it was proved that
the said Ephraim was on the land at the time of the division in
1793, and that it remained unimproved and wild land, until his
death in 1810. But there was no evidence of any other entry
by said Ephraim, the ancestor, during his lifetime.

The tenant claimed by a succession of mesne conveyances,
all recorded before 1797 ; the description of the land conveyed
giving no metes and bounds on the southerly side, which bounds
on the land released to the Coburns ; but giving a northerly
boundary, and thence southerly far enough to contain sixty acres
and half an acre ; by which conveyances the land described in
the deeds vested in Samuel Sherburne. Said Sherburne, by
deed of March 25th 1797, recorded April 26th 1797, conveyed
a part of the land to Hezekiah Hildreth, by metes and bounds
not embracing the demanded premises ; and by deed dated Feb-
ruary 17th 1798, and recorded on the 24th of the same month,
conveyed to said Hildreth other land, which the tenant con-
tended did embrace and describe the demanded premises.

The tenant also offered evidence to prove that said Hildreth,
in the spring of the year 1798, entered on the land, pretending
to claim under the last mentioned deed ; caused the southerly
line, which would enclose the demanded premises (which are
about twenty acres of the northerly part of the lot set off to the
said Ephraim in 1793, at the time of the aforesaid division)
to be run out by a surveyor ; and made a lop-fence by felling
trees and cutting stakes and poles over that line : That the
fence was kept up for several years, and till after the death of
the demandants' ancestor, sufficient to stop and keep in cattle :
That the demanded premises, together with the other land so

enclosed, were pastured by the said Hildreth and those claiming title under him, between the years 1800 and 1810 ; and that wood for the use of the tenants in occupation, and valuable timber, was cut off for several years : But there was no evidence of any notice of the existence of this fence to the demandants' ancestor during his lifetime ; and the whole of the said lot of thirty-four acres still remained wild land, and the said fence ran through the woods.   Two or three years before the death of the demandants' ancestor, the tenant of Royal Makepeace held the land, and for rent agreed to and did make twenty rods of stone wall a year, on the line of the same hedge or bush fence before named, for two years — the said Makepeace having let it to him on those terms, and then claiming to hold it under a deed from said Hildreth.

Upon this evidence the tenant contended, that the entry of Hildreth under a deed duly executed and recorded, was a disseizin of the demandant's ancestor ; and he moved for instructions to the jury, that if they believed that the deed from Sherburne embraced the demanded premises, the giving of that deed, and the recording and entry under it gave him a *primâ facie* title against Coburn, who claimed by no recorded deeds nor actual occupation : That the fact of his deed being recorded, in connexion with the fact that the deeds, under which the demandants' ancestor claimed, were not recorded, and he not in actual occupation, was material to the issue to the jury ; and that as Coburn had no title of record, the acts of occupation by the tenant, and those under whom he claimed, operated as a disseizin of Coburn, although those acts might not have so operated, if Coburn's title had been of record.

The judge refused to give these instructions, and instructed the jury that the fact of the tenant's deeds being recorded prior to the deeds under which the demandants claim, was wholly immaterial, under the facts of this case.   If this instruction was wrong, the verdict, which was for the demandants, is to be set aside and a new trial granted.

*Hopkinson*, for the tenant.

*Robinson*, for the demandants.

WILDE, J.   The tenant claims title to the demanded prem-
ises under one Hildreth, and at the trial offered evidence, tend-
ing to prove that the said Hildreth, in the year 1798, entereu
on the demanded premises, under a conveyance to him by metes
and bounds, which, as it was contended, included the demanded
premises ; that the deed of conveyance to him was duly re
corded a few days after its date, and that Hildreth caused his
lot, so purchased, to be surveyed, and that he made a lop-fence,
as it is called, on his southerly line adjoining the land of the
demandants' ancestor, which was kept up several years and
until after his death.

On this evidence, the chief justice was requested to instruct
the jury that the entry of said Hildreth under said deed, and
his subsequent claim and occupation, would in law amount to an
actual disseizin of the demandants' ancestor ; and that as the
said Hildreth's deed was recorded long before the deed to the
demandants' ancestor, less notorious occupation by him would
operate as a disseizin, than would be necessary if his deed had
not been recorded.

These instructions the chief justice refused to give, and he
instructed the jury that the fact of the tenant's deeds being re-
corded prior to the deeds under which the demandants claim,
was wholly immaterial.

This instruction is unquestionably correct, according to the
decision in *Bates* v. *Norcross*, 14 Pick. 224.   The question on
this point was fully discussed and satisfactorily decided, on prin-
ciple and on the authorities, in that case.   The only question
therefore now to be decided is, whether the jury ought not to
have been instructed, that the acts of possession of the tenant,
and of those under whom he claims, were sufficient to constitute
a disseizin.   That these acts of possession, accompanied with a
claim of title, would be sufficient to entitle the tenant to an
action of trespass or ejectment against a stranger having no title
or prior possession, we do not doubt ; but we think it equally
clear that such a possession does not by law operate as a dis-
seizin of the legal owner.   The acts of a wrongdoer must be
construed strictly, and the owner is not to be barred of his right,

by an adverse claim and possession, unless he forbears to assert his title for the time limited by the statute, after notice of such adverse possession, either express or implied. And such notice is not to be presumed by the court, though it may be found by the jury on proof of circumstances raising such a presumption. 7 Mass. 383. 15 Mass. 498. 5 Pick. 135. 6 Johns 197.

Now it appears, by the report of the case, that there was no evidence of any actual notice to the demandants' ancestor of the existence of the fence, on which the tenant's counsel so much relies ; and such a lop-fence, or possession fence, as it is sometimes termed, running as it did through woodland, we do not consider as sufficiently notorious, as indicating the limits of an adverse possession, to justify the jury in presuming that the demandants' ancestor had notice of it. To make out an adverse possession in ejectment (as it was correctly decided in *Jackson* v. *Schoonmaker*, 2 Johns. 230,) the tenant must show a substantial inclosure, an actual occupancy, definite, positive, and notorious. It is not enough to make what is called a possession fence, merely by felling trees and lapping them one upon another round the land. And so it has been frequently and uniformly held in this Commonwealth.

We are of opinion that no such adverse possession was proved in the present case ; and that the court would not have been justified in instructing the jury according to the request of the tenant's counsel.

*Judgment on the verdict.*